IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 5, 2000 Session


**HARRY FLETCHER, ET AL. v. ANTHONY EDWIN BICKFORD, ET AL.**


**Appeal from the Circuit Court for Hamilton County**
**No. 96CV 1404    Hon. W. Neil Thomas, III, Judge**
**FILED JANUARY 5, 2001**

**No. E2000-01020-COA-R3-CV**

---

Plaintiff's car was caught between the minivan in front of him and the dump truck behind him when the minivan and Plaintiff's car stopped to avoid an obstruction in the roadway. The dump truck was unable to stop and hit Plaintiff's car. The jury returned a verdict for Plaintiff for $225,000. The jury allocated 80 percent of the fault against the dump truck driver and owner and 20 percent of the fault against Plaintiff's uninsured motorist insurance carrier on behalf of the unknown driver of a truck which dropped the obstruction onto the road. The dump truck driver and owner appeal, raising issues of law including the introduction of claimed inadmissible evidence, prejudicial final argument, improper and incomplete jury instructions, jury misconduct and the failure of the Trial Court to grant Defendants' motions for directed verdict and judgment notwithstanding the verdict. We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed; Case Remanded.**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, J., and CHARLES D. SUSANO, JR., J., joined.

Michael R. Campbell, Chattanooga, Tennessee, for Appellants Anthony Edwin Bickford and Robert Gamble.

G. Brent Burks, Chattanooga, Tennessee, for Appellees Harry Fletcher and Phyllis Fletcher.

Ronald D. Wells, Chattanooga, Tennessee for Nationwide Insurance Company.

Gary W. Starnes, Chattanooga, Tennessee for Blue Cross & Blue Shield of Tennessee.

# OPINION

## Background

On July 13, 1995, Harry Fletcher ("Plaintiff") was driving his 1988 Pontiac Trans Am east during afternoon rush hour in heavy traffic on I-24 in Chattanooga, Tennessee. In front of Plaintiff's vehicle was a minivan driven by Rhonda Roddy. Behind Plaintiff's vehicle was a dump truck driven by Anthony Bickford ("Bickford") an employee of Beach Trucking, a partnership of defendants Solon Beach and Robert Gamble. A railroad crosstie was lying on the roadway, exacerbating rush hour traffic problems as motorists came upon the obstruction and undertook evasive maneuvers. Ms. Roddy saw the traffic in front of her come to a stop. She slowed down, and then saw the crosstie in the roadway in front of her for the first time. As she slowed down further and tried to maneuver over or around the obstruction, Plaintiff slowed down behind her. Bickford slowed down behind Plaintiff, but Bickford's dump truck rear-ended Plaintiff's Trans Am, which then rear-ended Roddy's minivan. Plaintiff sustained neck and spinal injuries resulting in loss of work and $25,349 in medical expenses.

Plaintiff brought this suit for damages against Bickford, the dump truck driver, and owners of the truck, Beach and Gamble. Nationwide Insurance Company, which provided uninsured motorist coverage for Plaintiff's wife, Phyllis Fletcher (also a plaintiff), was served with a copy of the Complaint pursuant to the Tennessee Uninsured Motorist Coverage Act, T.C.A. § 56-7-1201 *et seq.* Beach was never served with process. Bickford and Gamble ("Defendants") answered, alleging that the accident was caused by the negligence of a tractor trailer driver who had suddenly swerved from the right lane of Interstate 24 into the middle lane, inadvertently throwing the crosstie from its trailer into the path of a vehicle in front of Plaintiff creating a hazardous, emergency situation which caused the accident. Nationwide answered, admitting that it provided uninsured motorist coverage to Ms. Fletcher but denying negligence on the part of the "John Doe" unknown motorist who allegedly dropped the crosstie onto the roadway.

Trial was held July 6 through July 9, 1999. The first day of trial was devoted entirely to voir dire of prospective jurors who were questioned extensively by counsel for Plaintiff and Defendants. A number of prospective jurors were excused. On the second day of trial, Ms. Roddy testified that, on the afternoon of the accident, she was driving home and was annoyed because the traffic was heavy and would slow down and then pick up, causing her to wonder if there was an accident ahead. She described the scene:

> At one point the car in front of me seemed to resume speed and got away from me and immediately upon the car moving away, I realized what turned out to be a cross tie in the road . . . I somewhat panicked because it was large enough that I was afraid had I just gone right across it, that it would bump up under the car or cause some problem for me to lose control . . . so I slowed as far down as I could to

> maneuver it. And right at the time that I approached it I felt that
> someone hit me in the back.

Ms. Roddy didn't see a truck drop the crosstie and doesn't know how it got in the road. It appeared suddenly in front of her car, and she thinks that is because the car in front of her cleared the obstruction and then pulled away from her car, leaving her next in line to confront the obstruction. When she saw the object, she had only a few seconds to decide what to do. She may have slowed down, or she may have stopped completely by the time she was hit from behind by Plaintiff's vehicle.[1] After the collision, Ms. Roddy got out of her car, went back to Plaintiff's car, and apologized to him because she thought she might have done a better job in trying to avoid the accident. While she was standing with Plaintiff, Bickford came up to them and also apologized to Plaintiff. Ms. Roddy testified that her minivan did not sustain any noticeable damage, but it looked to her as if Plaintiff's Trans Am was a total loss.

Officer George Perry Walden, the Chattanooga Police Department Officer who responded to the traffic accident, testified that one of the three persons involved in the accident, either Plaintiff, Bickford, or Ms. Roddy, told him at the scene that a crosstie had fallen off the back of a lowboy truck onto the roadway and caused the accident. The participants told him that the dump truck struck the Trans Am in the rear and knocked it into the minivan. Plaintiff told him that he saw the traffic in front of him stopping and that he stopped behind Ms. Roddy's car. Then he looked in his rear view mirror and saw Defendants' dump truck behind him, sliding, with its brakes locked and tires smoking. The dump truck hit Plaintiff's Trans Am, propelling it forward approximately 50 feet into Ms. Roddy's minivan. Bickford told him that he was glad when he saw the driver of the Trans Am get out of his car because he was afraid he had killed somebody.

Bickford was called by Plaintiff as an adverse witness and testified that on the afternoon of the accident he was traveling at the speed limit or five miles over the speed limit when he topped Missionary Ridge on I-24 heading east in the dump truck. He testified he was traveling in the left-hand lane of the three eastbound lanes, as he always does on that trip. As he was coming down the ridge, traveling at about 55 miles per hour, he observed a tractor and lowboy trailer carrying a Euclid dump truck. When he first saw the lowboy, that vehicle was 200 to 300 feet ahead of him, in the right-hand lane. After the lowboy passed the Moore Road exit, the driver changed into the center lane, and at that point, Bickford saw the crosstie, which was being used as a block behind a wheel of the Euclid, come off the lowboy and fall in the direction of the roadway to the left. He did not see exactly where the crosstie landed, but he did see many vehicles swerving. At that point, he "hit" or "feathered" his brakes to try to slow down. Then he saw the rear brake lights of the Trans Am in front of him about 80 to 100 feet away. He normally leaves about that much distance between his dump truck and the vehicle in front of it, because "if you leave more room than that, they will pull in anyway." Although he thought he had room to stop, he was mistaken and hit the Trans Am with a heavy impact while traveling about five to ten miles per hour. He thought he had killed

---

[1] When artfully re-crossed by Mr. Campbell, counsel for Defendant, Ms. Roddy testified that she did not have time to stop before her vehicle went right over the cross tie, and that she might have caused the accident.

Plaintiff. When questioned on cross-examination by counsel for Nationwide Insurance Company, he agreed that he had the responsibility to keep a lookout for objects in the road, to keep his vehicle under control, and to be able to stop, whether for another vehicle or for an object in the roadway.

Plaintiff testified consistently with Bickford and Ms. Roddy as to the traffic conditions on the day of the accident. He testified that, because of his experience as a defensive driving instructor, he "literally abides by the two second rule that the National Transportation and Safety Board and National Safety Counsel recommend," i.e., "I always keep a couple of car lengths between myself and the car in front." He said that when Ms. Roddy's minivan in front of him stopped, he stopped, and he still had a couple of car lengths between his car and hers. Then he looked in his rearview mirror, saw the dump truck behind him, knew or felt like the truck would not be able to stop and that he had nowhere to go, and so he pulled up as close as possible to the van and stopped. He looked in the rearview mirror again and saw the dump truck with its brakes locked and its wheels or tires smoking. He knew the truck was not going to stop, so he put his hands over the steering wheel, and his head down on his arms, and waited in "sheer terror, because I knew I was dead."[2] He recalls that the dump truck hit his car and pushed it forward, but he cannot describe the force of the impact because things happened so quickly. ("I said, thank God I'm not dead. That's really all I know about the impact itself.") Plaintiff also testified that he and the driver of the minivan slowed and then stopped appropriately when confronted with the obstruction in the roadway, and that he never did anything he considered to be an emergency or panic situation in trying to stop. He never saw the car ahead of him skid or slide or swerve, and he never heard any tires squeal in front of him. All of the changes in speed of the minivan, and all of his changes in speed, were gradual. Moreover, after the accident, he stood against a railing alongside the road and looked up and down the line of traffic, and he observed that the only accident caused by the crosstie was the one involving the dump truck.

Plaintiff testified that he was in shock immediately after the accident and did not feel any pain, but after he got out of the car and sat down on the guardrail, he began to feel strain. As time went on, he started getting "sore and achy" but declined the police officer's recommendation to go to the hospital in an ambulance because his wife was on her way to the scene, and he wanted her to transport him. He believed that ambulance travel was for life-threatening injuries and thought that he did not need it. His wife took him to the emergency room, where he was x-rayed to rule out broken bones and given pain medication. He was told to see an orthopedic specialist the next day, which he tried to do for four days, but could not get an appointment. Finally, he called a FAA Medical Examiner, who called a friend, Dr. Phillip Bryant, an osteopathic doctor, and set up an appointment for the following day. Although Plaintiff had back surgeries ten years prior to this accident, he had no residual complaints or pain in his back, neck or arm from that condition and was in good health at the time of the accident. Dr. Bryant prescribed pain and anti-inflammatory medication and physical therapy, including hydrotherapy and deep tissue massage. Plaintiff testified he lost about 400 hours of work. His salary was $55,000 annually at the time of the accident. During his recovery period, he and his wife moved to North Carolina for professional reasons where

_____

[2]Plaintiff, an experienced pilot, testified that "if I had had an ejection seat, I would have been out of there."

he started seeing doctors at Charlotte Orthopaedic Group. As stated, his medical expenses were $25,349.

Plaintiff testified that since the accident, he is no longer able to snow ski with his wife as was their custom, and he had to quit his softball league because he can no longer play. Also, although flying airplanes has always been "the love of his life," and he normally flew five hours a week, he stopped flying planes and being a flight instructor after the accident because he was not able when flying to get out and walk around when he experienced pain, as he could when traveling by car. Plaintiff sold his airplane and has not kept his medical certificate up to date. He can no longer work in the yard with his wife and can no longer cut and split firewood.

All of the above-described testimony having been heard, the jury was dismissed for the day, after which Defendants' counsel moved for a mistrial. For grounds, Defendants argued that, earlier in the day, counsel for Nationwide Insurance Company had asked Plaintiff, "[i]sn't it true that you were paid for the car by or on behalf of Mr. Bickford and Mr. Gamble?" and Plaintiff had replied, "Yes, sir." Defendants' counsel had objected to the question in a bench conference after it was posed, whereupon the Trial Court had "allowed Mr. Wells to continue with his examination." The Court responded to the motion for mistrial by explaining that the examination did, indeed, continue, but "it wasn't on that same subject . . . I said 'let's preserve it and discuss it when we've excused the jury.' " In arguing the motion for mistrial, Defendants' counsel opined that "there's no way to unring that bell . . ." and that the evidence was inadmissible and highly prejudicial. Plaintiff's counsel responded that Plaintiff had no part in the colloquy and would be greatly prejudiced by a mistrial. Counsel for Nationwide Insurance defended the question by arguing that he had structured the question very carefully so as not to "bring insurance into it" and had offered the payment as admission against interest in a hotly contested case of liability in which Defendants had pointed the finger of liability at Nationwide. The Trial Court and all counsel agreed to research the problem overnight. The next morning, Defendants' counsel told the Trial Court:

> I want some way to resolve this problem without ringing this bell again any louder than it has to be rung. So what I would like and suggest and ask the Court to do is I want the parties to stipulate that no payment was made on behalf of Bickford and Gamble, that the testimony to that effect was inadvertent on the part of Mr. Fletcher, not deliberate because he didn't know - - you know, he didn't know whose name's on the check or remember that. So I want the parties to stipulate that no payment was made on behalf of Bickford and Gamble, and I want the Court to give a specific curative instruction to the jury to disregard that testimony - - and I've prepared a proposed curative instruction - - and then poll the jury to see if they can do that . . . [i]n the absence of that, I stand on my motion for mistrial . . . .

Plaintiff's counsel admitted that, after considerable research, he was compelled to agree with Defendants' counsel that the evidence was inadmissible under Tennessee Rule of Evidence 408, but

that he could not stipulate that no payment was made on behalf of Bickford and Gamble, since Gamble is a partner in Beach Trucking, and the payment check lists Beach Trucking as the insured. Counsel for Nationwide Insurance Company also agreed that, after extensive research, he had concluded that the evidence was inadmissible, and apologized for its attempted introduction into evidence.[3] The three attorneys and the trial judge then engaged in a substantial discussion about the best way to correct what all agreed was an error. Defendants' counsel vigorously insisted that either the jury be instructed and polled as described above or a mistrial be declared. The Trial Court declined to so order, and instead instructed the jury as follows:

> Let me start off by saying yesterday there was certain evidence that was given by Mr. Fletcher to the effect that he received compensation for his car. Let me instruct you now that that evidence is not admissible and you should disregard it. Those were matters which we discussed with the attorneys this morning and last evening. As I indicated to you at the outset of this trial, sometimes I will strike evidence or not permit evidence to be introduced; and I indicated to you that an unanswered question should not be given any weight and if I instruct you to disregard evidence, that you should not consider that evidence in your deliberations. Consequently, I am instructing you that you should not consider the evidence that was given on the payment for Mr. Fletcher's car in your deliberations. Let me get a quick show of hands, make sure everybody can follow that instruction and disregard. If you can, please raise your right hand. (Whereupon, all Jurors raised their hands.) Okay. Let the record reflect that all jurors, as I knew they would, said they would.

Plaintiff rested his case and the defense then called Bickford, who testified that he had kept 80 to 100 feet between his dump truck and Plaintiff's Trans Am during the trip down the Missionary Ridge cut, except for when cars would cut in front of the truck. When he saw the crosstie being thrown off the lowboy, he reacted immediately by feathering his brakes. When he hit his brakes, his dump truck was about 80 feet behind Plaintiff's Trans Am, and there was nowhere to go except straight ahead because the other lanes were full. When his truck actually hit the Trans Am, he was probably going about five to ten miles an hour. After the impact, the truck traveled about three to five feet before it stopped. The impact pushed the Trans Am about 30 feet. When he got out of the truck, he found the crosstie a few feet in front of the dump truck and a few feet behind the Trans Am, in the middle of the road. On cross-examination, Bickford testified that he does not know the stopping distance of the dump truck when it is driven at 45 miles per hour and that he sometimes leaves less than 80 feet between himself and other cars in order to keep cars from cutting in front of him. We reproduce a portion of that testimony:

---

[3]Whereupon the trial judge responded, " . . . everybody makes mistakes . . . that's the nature of this game . . . as a matter of fact I was taught that the definition of trial practice is making the least number of errors."

Q:      And you consciously as a dump truck driver, knowing
        you're driving a dump truck at 14 to 17 tons, made
        that decision to prevent people from cutting in front of
        you to follow too closely?

A:      Yes sir, if that's too close.

Q:      Well, wouldn't you agree with me, Mr. Bickford, that
        if you can't stop in time [and] smash the rear end of a
        Trans Am, you're following too closely?

A:      Yes, sir.

At the close of trial, Bickford and Gamble moved for a directed verdict and for the Court to find as a matter of law that there was a third vehicle involved which threw a crosstie into the road. Counsel for Nationwide Insurance Company objected, arguing that "it's all disputed fact." The Trial Court held that the issues raised were disputed issues of fact for the jury and declined to grant the motion.

The parties then engaged in final argument. As pertinent to this appeal, Defendants' counsel stated during final argument that "there are no lost wages in this case." He also argued, as pertinent:

I want to speak bluntly to you here. I don't intend to offend anybody.
The nature of this case is a suit for money and the worse you think the
plaintiff is hurt, the more money the plaintiff thinks you're going to
award him. This is what this suit is about.

Plaintiff's counsel, in rebuttal of Defendants' argument that there were no lost wages, stated:

Lost earning capacity? Mr. Campbell told you there's no claim for
lost wages. He just wants to forget. He just wants to forget Harry
Fletcher lost 400 hours from work at Blue Cross - Blue Shield. Four
hundred hours times $28 an hour is $7,200.

Plaintiff also attempted to respond to Defendants' argument that "the nature of this case is a suit for money, and the worse you think the plaintiff is hurt, the more money the plaintiff thinks you're going to award him. This is what this suit is about." In response, Plaintiff's counsel argued:

Mr. McMahan:      Insurance companies, trucking companies understand one
                  thing. They understand money. They don't care about
                  people.

| Mr. Campbell: | Your Honor, I object to this argument. |
|---|---|
| Mr. McMahan: | They don't care about people. |
| Mr. Campbell: | I object to this argument. It's improper. They don't care about people, this is an appeal to passion and prejudice. |
| The Court: | I'll overrule the objection, Mr. Campbell. I think this is closing argument. Go ahead, Mr. McMahan. |

After the arguments were heard, the jury was dismissed and Defendants again moved for mistrial, because "there was not a shred of proof in this record that this man made $28 an hour. Argument is based on the facts. I objected to that. The argument that appealed to passion and prejudice that trucking companies don't care about people. I object[ed] to that." The Trial Court found that Plaintiff's argument that he earned $28 an hour was proper, based on an annual salary of $55,000 and an 1800 hour work year. ("He could've used $33 an hour.")

The jury returned a verdict for Plaintiff for $225,000 and assessed 80 percent of the fault against Defendants and 20 percent of the fault against Nationwide Insurance Company. Defendants moved for a new trial and for a judgment notwithstanding the verdict. They later supplemented their Motion for New Trial by adding a new ground, that juror #36, Mr. Karl McKnight, had failed to disclose during jury selection that he had sustained a prior spinal injury and had undergone a spinal fusion. The Trial Court held an evidentiary hearing in November 1999 during which all of the jurors were examined about their deliberations. On December 14, 1999, the Trial Court denied Defendants' Motions for New Trial and for Judgment Notwithstanding the Verdict. Defendants Bickford and Gamble appeal.

### Discussion

Defendants raise the following issues in this appeal, which we quote:

1. Whether the trial court erred in failing to grant these defendants' motion for mistrial following the introduction of evidence by co-defendant Nationwide that the property damage to plaintiffs' vehicle had been paid by or on behalf of defendants Bickford and Gamble, because the court's curative instruction to the jury was inadequate to remove the prejudicial effect of the evidence on the issue of comparative fault.

2. Whether the trial court erred in failing to sustain these defendants' objection to the final argument by plaintiff's counsel which was inflammatory, prejudicial, and contained

-8-

statements with no evidentiary basis, and erred in failing to grant these defendants' motion for mistrial because of said argument.

3.  Whether the trial court erred in charging the jury on past loss of earning capacity as an element of damages in the absence of any proof as to how much the plaintiff earned on an hourly basis.

4.  Whether the trial court erred in failing to give these defendants' requested jury instruction number 7 that the following too closely statute, T.C.A. § 55-8-124, does not apply where a driver encounters a dangerous condition he has no reason to anticipate.

5.  Whether the trial court erred in failing to give these defendants' requested jury instruction number 2 regarding foreseeability.

6.  Whether the trial court erred in failing to grant these defendants' motion for directed verdict and motion for judgment notwithstanding the verdict.

7.  Whether the trial court erred in failing to grant these defendants' motion for new trial based on the failure of juror #36, Karl McKnight, to disclose during the jury selection process that he had sustained a prior spinal injury and had undergone a spinal fusion.

Our standard of review as to findings of fact by a jury in a civil action is limited to determining whether or not there is any material evidence to support the verdict. Tenn. R. App. P. 13(d). Appellate courts do not determine the credibility of witnesses or weigh evidence on appeal from a jury verdict. Where the record contains material evidence supporting the verdict, the judgment based on that verdict will not be disturbed on appeal. *Reynolds v. Ozark Motor Lines, Inc.,* 887 S.W.2d 822 (Tenn. 1994). However, a Trial Court's conclusions of law in a jury trial are subject to a *de novo* review. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 28 (Tenn. 1996). In addition, Tenn. R. App. P. Rule 36(b) provides:

A final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.

-9-

Defendants' first issue on appeal concerns an evidentiary ruling of the Trial Court. Our standard of review of the Trial Court's evidentiary rulings is whether the Trial Court abused its discretion:

> In Tennessee, admissibility of evidence is within the sound discretion of the trial judge. When arriving at the determination to admit or exclude even that evidence which is considered relevant Trial Courts are generally accorded a wide degree of latitude and will only be overturned on appeal where there is a showing of abuse of discretion.

*Otis v. Cambridge Mut. Fire Ins. Co.,* 850 S.W.2d 439, 442 (Tenn. 1992).

During cross-examination of Plaintiff, counsel for Nationwide Insurance Company asked: "[i]sn't it true that you were paid for the car by or on behalf of Mr. Bickford and Mr. Gamble?" Plaintiff replied, "Yes, sir." Defendants' counsel objected to the question in a bench conference after it was posed, but the Trial Court "allowed Mr. Wells to continue with his examination." Defendants then moved for a mistrial based on the introduction of that inadmissible evidence. The Trial Court declined to so order, and instead instructed the jury:

> That evidence is not admissible and you should disregard it . . . I am instructing you that you should not consider the evidence that was given on the payment for Mr. Fletcher's car in your deliberations. Let me get a quick show of hands, make sure everybody can follow that instruction and disregard. If you can, please raise your right hand. (Whereupon, all Jurors raised their hands.) Okay. Let the record reflect that all jurors, as I knew they would, said they would.

In this case, the parties and the Trial Court agree that the evidence in question was inadmissible. The Trial Court gave a curative instruction requiring all jurors to raise their hands to acknowledge that they would not consider the inadmissible evidence. It is not reversible error for a Trial Court to refuse to grant a mistrial upon the basis of improper testimony where the testimony is corrected by instructions to the jury that the jury is to ignore the testimony and is not to consider it. *Brown v. State,* 423 S.W.2d 493, 495, 496 (Tenn. 1968). We find no error by the Trial Court on this issue. We further hold that even if it were error, the record as a whole does not support a finding that it more probably than not affected the judgment or would result in prejudice to the judicial process. Tenn. R. App. P. Rule 36(b). Accordingly, affirm the Trial Court's refusal to grant a mistrial on that basis.

Defendants' second issue is whether the Trial Court erred in failing to sustain Defendants' objection to a portion of Plaintiff's attorney's final argument and then in refusing to grant a mistrial based on this prejudicial final argument. When a trial judge refuses to grant a new trial based on an attorney's final argument, we may not interfere with this action unless the attorney's argument was clearly unwarranted and made purely for the purpose of appealing to passion,

prejudices and sentiment which cannot be removed by sustaining the objection of opposing counsel. *Davis v. Hall,* 920 S.W.2d 213, 217 (Tenn. Ct. App. 1995); *Perkins v. Sadler,* 826 S.W.2d 439, 442 (Tenn. Ct. App. 1991). Consistent with this rule, decisions of trial judges with respect to the conduct of attorneys in open court are examined using the abuse of discretion standard of review. *Harris v. Thurmond,* No. 02A01-9803-CV-00074 (Tenn. Ct. App. March 17, 1999) 1999 WL 142382, *5; See *In re Ellis,* 822 S.W.2d 602, 605 (Tenn. Ct. App. 1991). The portion of Plaintiff's final argument objected to included harsh words about both insurance companies and trucking companies:

> Insurance companies, trucking companies understand one thing. They understand money. They don't care about people . . . they don't care about people.

Defendants objected, arguing that "this is an appeal to passion and prejudice." The Trial Court overruled the objection. Although there is support for the argument that this statement was made "for the purpose of appealing to passion, prejudices and sentiment," the record shows that Defendants had first made a comparable appeal to passion, prejudice and sentiment when their attorney argued:

> I want to speak bluntly to you here. I don't intend to offend anybody. The nature of this case is a suit for money and the worse you think the plaintiff is hurt, the more money the plaintiff thinks you're going to award him. This is what this suit is about.

Viewing the opposing arguments as a whole, Defendants first said, "[this is] a suit for money and the worse you think Plaintiff is hurt, the more money Plaintiff thinks you're going to award him." Plaintiff responded by arguing, "insurance companies, trucking companies understand one thing. They understand money. They don't care about people . . . they don't care about people." Given this sequence of events, we find the Trial Court did not abuse its discretion in its decision with respect to the argument made by Plaintiff's counsel. *Harris v. Thurmond,* No. 02A01-9803-CV-00074 (Tenn. Ct. App. March 17, 1999),1999 WL 142382, *5; *In re Ellis,* 822 S.W.2d 602, 605 (Tenn. Ct. App. 1991).

Defendants' third, fourth and fifth issues involve alleged errors in the Trial Court's jury instructions. When issues involving the jury charge are raised on appeal, we review the jury charge in its entirety and consider it as a whole in order to determine whether the Trial Court committed prejudicial error. The charge will not be invalidated as long as it fairly defines the legal issues involved in the case and does not mislead the jury. *Otis v. Cambridge Mut. Fire Ins. Co.,* 850.W.2d 439, 446 (Tenn. 1992).

There was much discussion between counsel and the Trial Court about the jury instructions. The Trial Court determined, as pertinent to this appeal, that (1) Plaintiff's testimony about his annual salary and the 400 hours of time lost was sufficient to permit a jury instruction about lost wages, (2) the jury should not hear Defendants' requested jury instruction number 7 on

the inapplicability of the "following too closely statute," and (3) the issue of foreseeability was adequately covered without Defendants' requested jury instruction number two.

On the first jury instruction issue, Plaintiff testified that as a result of the accident, he missed 400 hours of work, including time when he was unable to work and time used in going to doctors' appointments and therapy. He also testified that his annual salary at the time of the accident was $55,000. Plaintiff's counsel then calculated that a $55,000 salary equated to about $28 per hour, multiplied that by the 400 hours time lost and argued to the jury that Plaintiff had lost wages in that amount. The Trial Court found this to be a reasonable argument and gave an appropriate jury instruction on lost wages based on this proof presented to the jury of Plaintiff's annual salary of $55,000 and 400 hours time lost. The Trial Court found no fault with this argument, and neither do we. We find this issue to be without merit.

Defendants' second jury instruction issue is that the Trial Court erred in not giving the jury his requested jury instruction number 7. That requested instruction states: "The following too closely statute, Tenn. Code Ann. § 55-8-124, does not apply where a driver encounters a dangerous condition he had no reason to anticipate." Defendants argue that this instruction should have been given to the jury because:

> The undisputed proof was that a railroad crosstie was thrown into the fast lane of Interstate 24 eastbound causing Rhonda Roddy to suddenly decelerate and stop in the fast lane of the interstate, after which plaintiff Fletcher stopped and was hit in the rear by Bickford.

Our careful review of the record in this case shows that Bickford admitted having consciously made the decision to follow too closely in order to prevent other drivers from pulling in front of him. When questioned, Bickford agreed that if he couldn't stop in time and smashed into the rear end of Plaintiff's car, he was following too closely. Moreover, Ms. Roddy testified that, despite the obstruction, she was able to stop. Plaintiff testified that he was able to stop behind Ms. Roddy. Plaintiff testified that he looked up and down the mile-long Missionary Ridge cut and observed that every other driver was able to stop in time to avoid a collision - only the dump truck was not able to stop. After considering the record as a whole, we hold that the Trial Court's refusal to give this requested instruction was not reversible error.

The third jury instruction issue Defendants raise is the Trial Court's refusal to instruct the jury as follows:

> Forseesability must be determined as of the time of the acts or omissions claimed to be negligent. The actor's conduct must be judged in light of the possibilities apparent to him at the time, and not by looking backward with the wisdom born of the event or with hindsight.

-12-

Defendants argue that this instruction was important because of the highly unusual circumstances of this accident, where a piece of railroad crosstie was thrown into, and obstructed, the fast lane of the Interstate highway. They argue that Bickford testified that he had previously come upon cans, bottles, trash and pieces of tire, but had never come upon anything the size and weight of a railroad crosstie, and therefore, the instruction regarding foreseeability was appropriate. The proof, however, shows that Bickford, in fact, came upon and hit the car in front of him, which was stopped in the road behind a minivan, which was also stopped in the road.

The Trial Court gave a detailed and comprehensive jury instruction. Considering the jury charge as a whole, we hold that the Trial Court properly instructed the jury based on the evidence and testimony of the witnesses at trial, the jury instructions fairly define the legal issues involved in the case and do not mislead the jury, *Otis,* 850.W.2d at 446, and the Trial Court's refusal to give Defendants' requested jury instruction number two was not error.

Defendants' sixth issue concerns the Trial Court's refusal to grant their motion for directed verdict and motion for judgment notwithstanding the verdict. Our standard of review of a Trial Court's decision on a Motion for Directed Verdict is well-settled. A directed verdict is appropriate only when the evidence is susceptible to but one conclusion. *Eaton v. McLain,* 891 S.W.2d 587, 590 (Tenn. 1994); *Long v. Mattingly,* 797 S.W.2d 889, 892 (Tenn. Ct. App. 1990). We must "take the strongest legitimate view of the evidence favoring the opponent of the motion." *Id.* In addition, all reasonable inferences in favor of the opponent of the motion must be allowed, and all evidence contrary to the opponent's position must be disregarded. *State Farm General Ins. Co. v. Wood,* 1 S.W.3d 658, 663 (Tenn. Ct. App. 1999) (quoting *Eaton,* 891 S.W.2d at 590; *Long,* 797 S.W.2d at 892). Applying these recognized standards, the proof in this case shows that Bickford, by his own admission, was following too closely and smashed into the car in front of him, while the other vehicles which had encountered the obstruction were able to maneuver without plowing into other vehicles. Defendants argue on appeal that "reasonable minds cannot differ that the sole, proximate cause of the accident was the negligence of John Doe, the unknown driver of the tractor-trailer truck which threw the crosstie into the fast lane of Interstate 24." This assertion flies in the face of Bickford's own testimony to the contrary, as well as other evidence in the record to the contrary. The evidence certainly is not susceptible only to one conclusion as argued by Defendants. We find this issue to be without merit.

Defendants' seventh issue is whether the Trial Court erred in refusing to grant a new trial based on the failure of a juror to disclose during the jury selection process that he had sustained a prior spinal injury and had undergone a spinal fusion. The juror's testimony during voir dire was as follows:

> Q:    And you said you were hit in the rear. Were there any personal injuries in that, Mr. McKnight?
>
> A:    No, no injuries.

Q:      Suffer any neck or back problems, sir?

A:      No.

The Trial Court, after holding a full evidentiary hearing in which the jurors were examined, found that this juror had answered "no" because he had interpreted the question to mean, 'Did you suffer any neck or back problems from the accident in which you were hit in the rear?' rather than 'Have you ever suffered any neck or back problems from *any* cause?' The Trial Court found the juror had interpreted the question reasonably and had answered it truthfully. The Trial Court found:

> The Court heard testimony from the juror in question that he understood the question to inquire of back injuries as a result of an accident, not whether he had ever suffered a back injury. Clearly, the transcript of the voir dire submitted to the Court shows that the context in which the juror was questioned regarding any back injury was that of a car wreck. As stated above, the juror confirmed this understanding at the time of the hearing. Thus, the issues presented in *Owen v. Arcata Graphics/Kingsport Press,* 813 S.W.2d 442 (Tenn. [Ct.] App. 1990) and *State v. Eason,* 1996 WL 727390 (Tenn. [Ct. Crim.] App. 1996) are not applicable. In any event, this court will not impugn the integrity of a juror or his answers to questions during voir dire under circumstances which are less than clear. The motion on this ground is, therefore, denied.

We read the Trial Court's finding to be based on a reasonable interpretation of the question posed during voir dire and on the juror's credibility. Because the trial judge is in a better position to weigh and evaluate the credibility of the witnesses who testify, we give great weight to the trial judge's findings on issues involving credibility of witnesses. *Randolph v. Randolph,* 937 S.W.2d 815, 819 (Tenn. 1996). We find this issue is without merit.

## **Conclusion**

The judgment of the Trial Court is affirmed and this cause is remanded to the Trial Court for such further proceedings as may be required, if any, consistent with this Opinion, and for collection of the costs below. The costs on appeal are assessed against Edwin Bickford and Robert Gamble and their surety.

_____
D. MICHAEL SWINEY, JUDGE